IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| WILLIAM CAROSELLI, SR. | : | |
| --- | --- | --- |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ALLSTATE PROPERTY AND | : | |
| CASUALTY INSURANCE COMPANY | : | No. 10-1671 |
| Defendants. | : | |

MEMORANDUM

**Schiller, J.**                                                                          August 16, 2010

William Caroselli, Sr. sued Allstate Property and Casualty Insurance Company ("Allstate"), on behalf of himself and others, for Allstate's failure to pay full benefits he asserts he is entitled to under his homeowner's policy with Allstate. Allstate contends, in its motion to dismiss presently before the Court, that pursuant to the unambiguous language of Caroselli's insurance policy, it paid to Caroselli all of the money he was owed as a result of his loss. The Court agrees with Allstate and therefore grants its motion to dismiss the Complaint.

**I.    BACKGROUND**

Allstate issued homeowners policy number 9 28 225229 12/30 to William Caroselli, Sr., with a policy period running from December 30, 2008, with no fixed date of expiration. The policy insured Caroselli's property at 407 Beech Street in Boothwyn, Pennsylvania. (Compl. ¶ 12; Def's Mot. to Dismiss Ex. A [Policy] at 1.) Allstate agreed to cover "sudden and accidental direct physical loss to property" described in the dwelling protection section. (Policy at 7.) The Policy limited liability for Caroselli's dwelling to $253,479. (*Id.* at 2.) The Policy includes an "**Important Notice**" that states the following:

> **DWELLING PROFILE**
> Allstate has determined that the estimated cost to replace your home is: $253,479
> The enclosed Policy Declarations shows the limit of liability applicable to Coverage A – Dwelling Protection of your homeowners insurance policy. The estimated replacement cost of your home is the minimum amount for which we will insure your home.
> The decision regarding the limit applicable to your Coverage A – Dwelling Protection is your decision to make, as long as, at a minimum, your limit equals the estimated replacement cost as determined by Allstate and does not exceed maximum coverage limitations established by Allstate.
> It is important to keep in mind that your Coverage A limits reflect a replacement cost that is only an estimate based on data that was available to us when we made this estimate (this data is described further below). The actual amount it will cost to replace your home cannot be known until after a covered total loss has occurred.

(*Id*. at 4.) The Policy explains how Allstate will pay for a loss covered by the dwelling protection provision, as follows:

> b) Actual Cash Value. If **you** do not repair or replace the damaged, destroyed or stolen property, payment will be on an actual cash value basis. This means there may be a deduction for depreciation. Payment will not exceed the Limit Of Liability shown on the Policy Declarations for the coverage that applies to the damaged, destroyed or stolen property, regardless of the number of items involved in the loss. **You** may make claim for additional payment as described in paragraph c) and paragraph d) below if applicable, if **you** repair or replace the damaged, destroyed or stolen covered property within 180 days of the actual cash value payment.
>
> c) Building Structure Reimbursement. Under **Coverage A – Dwelling Protection** . . . **we** will make additional payment to reimburse **you** for cost in excess of actual cash value if **you** repair, rebuild or replace damaged, destroyed or stolen covered property within 180 days of the actual cash value payment.
>
> Building Structure Reimbursement will not exceed the smallest of the following amounts:

> 1) the replacement cost of the part(s) of the **building structure(s)** for equivalent construction for similar use on the same **residence premises**;
>
> 2) the amount actually and necessarily spent to repair or replace the damaged **building structure(s)** with equivalent construction for similar use on the same **residence premises**; or
>
> 3) the Limit of Liability applicable to the **building structure(s)** as shown on the Policy Declarations for **Coverage A – Dwelling** . . . regardless of the number of **building structures** and structures other than **building structures** involved in the loss.

(*Id*. at 17-18.) Caroselli also purchased a Building Structure Reimbursement Extended Limits Endorsement - APC198 which changed certain terms of the Policy. The endorsement altered the Policy provision entitled "**How We Pay For A Loss.**" Specifically, the endorsement alters item three of the second paragraph of that provision to read:

> 3) 120% of the limit of liability applicable to the **building structure(s)** as shown on the Policy Declarations for **Coverage A – Dwelling Protection** . . . regardless of the number of **building structures** and structures other than **building structures** involved in the loss.

(Policy at Endorsement – APC198.) The endorsement continues:

> This endorsement applies only if, at the time of a covered loss, **you** have met the following conditions:
>
> 1) **You** insure **your dwelling**, attached structures and detached **building structures** to 100% of replacement cost as determined by **our** estimate completed and based on the accuracy of information **you** furnished;
>
> 2) **You** have accepted the Property Insurance Adjustment Condition, agree to accept each annual adjustment in the **Coverage A – Dwelling Protection** limit of liability, and pay any additional premium charged; and

3

> 3) **You** notify **us** within 60 days of the start of any modifications that increase the aggregate value of **your dwelling**, attached structures and detached **building structures** at the **residence premises** by $5,000 or more, and pay any resulting additional premium due for the increase in value.
>
> If, at the time of a covered loss, **you** fail to meet any of the conditions in 1), 2), or 3) above, then in **Section I – Conditions**, item 5., **How We Pay For A Loss**, under c), Building Structure Reimbursement, item 3) remains:
>
> 3) the Limit of Liability applicable to the **building structure(s)** as shown on the Policy Declarations for **Coverage A – Dwelling Protection** or **Coverage B – Other Structures Protection**, regardless of the number of **building structures** and structures other than **building structures** involved in the loss.
>
> All other policy terms and conditions apply.

(*Id.*) On or about June 28, 2009, Caroselli's home was destroyed in a fire. (Compl. ¶ 15.) Allstate determined that the building replacement cost for the home was $304,174.80 and that the claim was subject to a "recoverable depreciation" of $19,422.78, resulting in a net actual cash value loss of $284,752.02. (*Id.* ¶ 17.) Caroselli sought $284,752.02, claiming the Policy's Endorsement increased Allstate's liability limit to $304,174.80. (*Id.* ¶ 18.) Allstate paid to Caroselli the stated policy limit of $253,479, but refused to pay the additional money Caroselli claims it owed under the terms of the endorsement. (*Id.* ¶ 19.) Plaintiff asserts that Allstate will not pay out benefits under the endorsement unless he repairs, rebuilds, or replaces the dwelling within 180 days of the actual cash value payment. (*Id.* ¶ 20.) According to Plaintiff, Allstate's stance is contrary to the clear language of the Policy and has prevented him from rebuilding his home. (*Id.* ¶ 21.)

Plaintiff's Complaint contains a breach of contract claim, a statutory bad faith claim, and a Pennsylvania Unfair Trade Practices and Consumer Protect Law (UTPCPL) claim. The Complaint

4

is brought as a Class Action on behalf of:

> All homeowners insured under policies issued by Allstate Property and Casualty Insurance Company or other companies issuing policies of homeowners' insurance under the designation "ALLSTATE" which were in effect on or after February 14, 2004 who have submitted claims for property damage to their homes as a result of an occurrence as defined under the policies of insurance issued by ALLSTATE which have taken place on or after February 14, 2004, wherein ALLSTATE has refused to pay benefits pursuant to its **Building Structure Reimbursement Extended Limits Endorsement - APC198** for an actual cash value claim in excess of the stated policy limit until actual replacement or rebuilding has occurred.

(Compl. ¶ 6.)

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the non-moving party. *See Bd. of Trs. of Bricklayers and Allied Craftsman Local 6 of N.J. Welfare Fund v. Wettlin Assocs., Inc.*, 237 F.3d 270, 272 (3d Cir. 2001). A court should accept the complaint's allegations as true, read those allegations in the light most favorable to the plaintiff, and determine whether a reasonable reading indicates that relief may be warranted. *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A court need not credit "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

"Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to

dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1960. Although the federal rules impose no probability requirement at the pleading stage, a plaintiff must present "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of a cause of action. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Simply reciting the elements will not suffice. *Id*. (concluding that pleading that offers labels and conclusions without further factual enhancement will not survive motion to dismiss); *see also Phillips*, 515 F.3d at 231.

The Third Circuit Court of Appeals has recently directed district courts to conduct a two-part analysis when faced with a 12(b)(6) motion. First, the legal elements and factual allegations of the claim should be separated, with the well-pleaded facts accepted as true but the legal conclusions disregarded. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Second, the court must then make a common sense determination of whether the facts alleged in the complaint are sufficient to show a plausible claim for relief. *Id*. If the court can only infer the mere possibility of misconduct, the complaint must be dismissed because it has alleged – but has failed to show – that the pleader is entitled to relief. *Id*. at 211.

In considering a motion to dismiss, courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim. *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004).

## III.     DISCUSSION

### A.     Breach of Contract

To properly allege a breach of contract action under Pennsylvania law, a plaintiff must plead: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). As a general matter, contract interpretation is a matter for a court, not a jury, provided the contract is unambiguous. *Am. Eagle Outfitters v. Lyle & Scott, Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009). The ultimate goal of contract interpretation is to determine the intent of the parties. *Id*. The court should first turn to the written contract to divine intent. *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007). "When the language of the policy is clear and unambiguous, we must give effect to that language." *Kvaerner Metals. Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006). If, however, the policy provision is ambiguous, it is interpreted in favor of the insured. *Baumhammers*, 938 A.2d at 290. A contract is ambiguous if it is reasonably susceptible to different constructions and capable of being understood in more than one sense. *Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 243 (3d Cir. 2008) (citing *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429-30 (Pa. 2001)). "In the absence of an ambiguity, the plain meaning of the agreement will be enforced." *Id*.

Allstate argues that if the policyholder elects not to repair or replace the damaged, destroyed, or stolen property, Allstate will pay for the actual cash value for the claim up to the limit of liability shown on the policy declarations. (Def.'s Mem. of Law in Supp. of Mot. to Dismiss Compl. [Def.'s Mem.] at 7-8.) If, however, the insured repairs or replaces the damage within 180 days of the actual cash value payment, the building structure reimbursement clause kicks in, and Allstate will make

7

an additional payment. However, the building structure reimbursement will not be greater than the smallest of three amounts set forth in the Policy. One of the amounts was the limit of liability stated in the Policy's declarations. However, because the Policy included Endorsement - APC198, he could receive 120% of the limit of liability stated in the Policy's declarations, but only if he undertook to rebuild his home. (*Id.* at 8-9.)

Caroselli, on the other hand, contends that a fair reading of the Policy with Endorsement - APC198 is that the endorsement expressly increases the stated limit of liability by 20% from $253,479 to $304,174.80. (Pl.'s Statement of Facts and Mem. in Opp'n to Def.'s Mot. to Dismiss Compl. [Pl.'s Mem.] at 3.) Plaintiff notes that the endorsement twice clearly states that it changes the Policy, and the endorsement contains three conditions necessary for it to apply and none of those three conditions requires the home to be rebuilt before the increased limit applies. (*Id.* at 6.)

The Court agrees with Allstate's straightforward reading of the Policy's clear language. Plaintiff's reading of the contract fails for a number of reasons. First, Plaintiff is correct that the endorsement changes the Policy. Allstate did not hide that fact from the policyholder. But the endorsement clearly indicates that the changes it makes are to the building structure reimbursement provision. It does not follow that it altered other provisions of the Policy. The building structure reimbursement provision, and thus the endorsement, only apply if the insured "repair[s], rebuild[s] or replace[s] damaged, destroyed or stolen covered property within 180 days of the actual cash value payment." (Policy at 17-18.) An insured who does not rebuild can only receive actual cash value up to the liability limit and thus the endorsement is not relevant to payment of the claim. Second, the endorsement also states that "[a]ll other policy terms and conditions apply." Because nothing in the endorsement suggested that it altered the actual cash value provision or the liability limit, those

8

provisions remained unaltered. Third, the fact that the endorsement failed to mention rebuilding the home should have come as no surprise because the endorsement only applied if the policyholder undertook to rebuild or repair the property.

Additionally, Caroselli's reading of the Policy excises from it the actual cash value section and renders meaningless the $253,479 limit of liability. Caroselli's theory would always allow an insured to collect the building structure reimbursement, regardless of whether he undertook to repair or replace the damaged property. This contravenes the clear language of the Policy and the Court will not read the Policy in a way that excises certain language. *See LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647-48 (Pa. 2009) ("[I]n determining the intent of the contracting parties, all provision in the agreement will be construed together and each will be given effect. Thus, we will not interpret one provision of a contract in a manner which results in another portion being annulled.").

Plaintiff relies on Pennsylvania law holding that actual cash value is calculated by determining the repair or replacement cost of the building and subtracting applicable depreciation. He claims that it "logically follows that application of this rule would require the expended policy limit to apply to the replacement cost in order to determine actual cash value." (Pl.'s Mem. at 9.) The Court does not follow Plaintiff's logic. While depreciation might be factored in to determine actual cash value, that does not foreclose a policy from including a limit of liability. Here, it is irrelevant how actual cash value is calculated because the limit of liability applies.

Plaintiff's contention that Allstate sought to deprive Caroselli of his ability to repair, rebuild or replace his home is unfounded. (*Id.*) He was paid $253,479 pursuant to the Policy and would be eligible for 120% of the liability limit if he undertook to rebuild his home. The Court finds it hard

9

to believe that he would be unable to commence repairs with the money Allstate paid on the claim.

Finally, the endorsement is not illusory merely because the policyholder must insure his home for 100% of its replacement cost to receive the benefit of the endorsement. If he insured his home for full replacement cost, which was $253,479, and thus satisfied one of the conditions for the endorsement to apply, and repaired or replaced his home, he would be entitled to 120% of the limit of liability, or $304,174.80, assuming that was the smallest amount of the three possible payment amounts. But since he failed to even allege that he repaired or replaced the home, the endorsement does not even enter the analysis. The actual cash value provision clearly applies here and the language of that provision expressly caps his recovery to the limit of liability included in the Policy.

The Pennsylvania Superior Court considered the meaning of "actual cash value" in an Allstate homeowners policy in *Kane v. State Farm Fire and Cas. Co.*, 841 A.2d 1038 (Pa. Super. Ct. 2003). In *Kane*, policyholders sought to bring a class action alleging that various insurance companies, including Allstate, failed to fully indemnify them for partial losses because the insurance companies deducted depreciation from the actual cost to repair or replace the damaged portion of their buildings. The insurance companies, including Allstate, countered that the policies required a policy holder to first undertake to repair or replace the damaged property before being fully compensated. The Superior Court upheld the trial court's decision to dismiss the policyholders' breach of contract and bad faith claims. "[T]he phrase 'actual cash value' as used in [Allstate's policy] cannot mean replacement value . . . as such an interpretation would make the remaining policy language nonsensical." *Id*. at 1049. The court noted that the Allstate policy included "qualifying language indicating that 'actual cash value' will be the proffered compensation where the insured does not repair or replace the damage." *Id*. Because the insured would ultimately be

made whole upon repair of the damaged property, the court was not troubled by policy language that paid actual cash value if the insured did not repair the damage. *Id.* at 1050.

Here, the Policy language clearly states that absent repair or replacement within 180 days of the actual cash value payment, Allstate will pay actual cash value but "[p]ayment will not exceed the Limit of Liability shown on the Policy Declarations for the coverage that applies to the damaged, destroyed or stolen property, regardless of the number of items involved in the loss." (Policy at 18.) "[B]y failing to repair his damaged property within 180 days from receipt of Allstate's final payment, Plaintiff has failed to satisfy the condition precedent under the policy and is not entitled to make a claim for additional sums." *Renna v. Allstate Ins. Co.*, Civ. A. No. 92-20261, 1993 WL 404092, at *3 (N.D. Cal. Sept. 27, 1993) (citations omitted); *Md. Cas. Co. v. Knight*, 96 F.3d 1284, 1293 (9th Cir. 1996) (upholding policy, under California law, that required repair or replacement of property before replacement cost had to be paid by insurance company).

### B. Bad Faith

Caroselli also brings a claim under the Pennsylvania bad faith statute, 42 PA. CONS. STAT. § 8371. To prevail on a bad faith claim, an insured must show that the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim. *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 505 (3d Cir. 2004) (citing *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994)). To constitute bad faith for the failure to pay a claim, the insurer must have a dishonest purpose. *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005). Although the refusal to pay need not be fraudulent, mere negligence or bad judgment is insufficient. *Id*. The burden rests with the insured to show bad faith by clear and convincing

evidence. *Polselli v. Nationwide Mut. Fire Ins. Co.*, 126 F.3d 524, 528, 532 (3d Cir. 1997). To satisfy this standard, the insured must present evidence "so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." *Bostick v. ITT Hartford Group, Inc.*, 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999).

The bad faith claim arises from Allstate's purported failure to pay actual cash value benefits to Caroselli and members of the putative class although such benefits are, according to the Complaint, clearly required by the language of the Policy. (Compl. ¶ 29.) As noted in this Court's discussion regarding Plaintiff's breach of contract claim, Allstate properly paid to Caroselli the limits of liability pursuant to the clear language of the Policy. Therefore, Allstate had a reasonable basis for failing to pay additional monies to Caroselli and he cannot make out a bad faith claim against Allstate. *See Kelly v. Nat'l Liab. & Fire Ins. Co.*, Civ. A. No. 09-1641, 2010 WL 2736953, at *3 (E.D. Pa. July 12, 2010) ("Because the coverage determination was correct, as a matter of law, bad faith cannot be found.").

### C. UTPCPL

Plaintiff alleges that Allstate sold him an endorsement to the Policy that is "wholly illusory with respect to the coverage purportedly offered." (Compl. ¶ 31.) According to the Policy, an insured could only extend coverage under it to 120% of the stated policy limit if the insured fully insured the property to 100% of the replacement cost as determined by Allstate. (*Id*. ¶ 32.). But, Caroselli contends, if he fully insured his property, the stated limit of the Policy would be equal to the replacement cost of the property. (*Id*. ¶ 33.) Thus, under the terms of the Policy, he would never receive 120% and the endorsement he purchased was worthless.

The UTPCPL declares unlawful a number of "unfair methods of competition" and "unfair

or deceptive acts or practices." 73 PA. CONS. STAT. § 201-2(4) & *id*. § 201-3. The statute further permits persons who suffer a loss resulting from an unfair or deceptive method, act, or practice to bring a private action to recover damages. *Id*. § 201-9.2. To state a claim under the UTPCPL, a plaintiff must show deceptive conduct and an ascertainable loss. *See Hansford v. Bank of Am.*, Civ. A. No. 07-4716, 2008 WL 4078460, at *13 (E.D. Pa. Aug. 22, 2008). Additionally, a plaintiff must show that he justifiably relied on a defendant's wrongful conduct or representations and that such reliance caused harm.[1] *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 224 (3d Cir. 2008) ("[W]e conclude that private plaintiffs alleging deceptive conduct under the [UTPCPL] catchall provision must allege justifiable reliance."); *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007) ("[A] plaintiff alleging violations of the Consumer Protection Law must prove the common law fraud element of justifiable reliance."); *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004) ("To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance.").

Caroselli points to two purported misrepresentations made by Allstate: "first, that it would provide coverage to Caroselli in accordance with the standards and practices in effect in Pennsylvania and, second, by falsely representing to Caroselli and members of his class that the

---

[1] Plaintiff's Complaint does not clarify which provision of the UTPCPL he is relying on to support his claim, although his memorandum opposing Defendant's motion to dismiss makes clear he relies on the "catch-all" provision of the UTPCPL. The "catch-all" provision declares unlawful the "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 PA. CONS. STAT. § 201-2(4)(xxi). It is not clear if a plaintiff must plead all of the common law elements of fraud to state a claim under the catch-all provision. *See Chiles v. Ameriquest Mortg. Co.*, 551 F. Supp. 2d 393, 398-99 (E.D. Pa. 2008) (noting that courts have arrived at different conclusions when faced with deciding if plaintiff must prove all elements of fraud to make out UTPCPL claim under catch-all provision).

policy would provide benefits which were totally illusory." (Pl.'s Mem. at 16.) He further clarifies his claim when he states, "Allstate has made material misrepresentations of facts regarding coverages afforded when the policy was issued . . . followed by a second misrepresentation after the loss occurred claiming that Allstate owed only its stated policy limit rather than the Actual Cash Value of the loss." (*Id*. at 21.)

As stated earlier, a reading of the plain language of the Policy does not render the benefits contained in the endorsement illusory. Additionally, the Court rejects Caroselli's contention that he states a UTPCPL claim because Caroselli purchased a replacement cost policy yet failed to receive replacement cost upon the occurrence of a covered loss. Plaintiff did not receive replacement cost because he failed to rebuild his property, not because Allstate deceived him. He points to no statement or misrepresentation made by Allstate regarding what he would receive in the event of a loss. Rather, he points to the Policy which clearly forecloses his argument. He was not entitled to replacement cost because he failed to meet a clearly stated precondition to receiving replacement costs. It is not deceptive for an insurer to adhere to the unambiguous language of a policy and pay claims in accordance with those terms. Furthermore, the Court discerns no justifiable reliance asserted in the Complaint other than the terms of the Policy; the Court has already addressed this language.

Finally, despite Caroselli's protests, his UTPCPL claim is ultimately a charge that Allstate failed to pay on Plaintiff's claim. Under Pennsylvania law, an insurer's refusal to pay a claim is nonfeasance – as opposed to malfeasance – and cannot sustain a UTPCPL claim. *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 307 (3d Cir. 1995) ("[A]n insurer's mere refusal to pay a claim which constitutes nonfeasance, the failure to perform a contractual duty, is not actionable.")

14

## IV. CONCLUSION

The Policy language is clear and Plaintiff's failure to satisfy a condition precedent to payment under the endorsement is fatal to his claims. His case is therefore dismissed. An Order consistent with this Memorandum will be docketed separately.